UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

Geremiah Wheeler, Sarah Wheeler, Geremiah & Sarah Wheeler, as parents and next friends of M.W, G.W., C.W. and R.W., Minors, and Gail Sanchez;

Ann Pardi and James Raffa;

Stacy Curcio, Christopher Betro, and Stacy Curcio, as mother and next friend to A.C. and G.C., Minors;

Russ Semeran, Olga Semeran, and Paul Semeran;

Tara Patricia Hambly, Penny Patricia Hambly, and Tara Patricia Hambly, as mother and next friend to H.H. and R.V., Minors;

Richard Scott and Denise Scott;

Timothy Reynolds, Amy Lau, and Timothy Reynolds and Amy Lau, as parents and next friends to C.L and A.L, Minors;

Carlos Fernando Cruz Sanchez, Fernando Crus Contreras, Silvia Patricia Sanchez Baker, Tanya Maria Cruz Sanchez, and Jaime Mauricio Sanchez Morales

Dawn Pannell and Dawn Pannell, as mother and next friend to N.P., Minor;

Lisa Walchusky and George Walchusky;

Mary E. Schuster;

Sarah Schmidt and Sarah Schmidt, as mother and next friend to A.C. and S.C., Minors;

Karen McIntyre;

Eddie Herrero, Maria Herrero, Eddie & Maria Herrero, as parents and next friends to E.H. and E.H, Minors;

Ella Morro;

Thomas Stepanski, Judith Stepanski, Suzanne Goble, William Kenneth Goble, Jessica Goble, Alex Goble, and Kevin Farrah;

Michel Korman, Suzi Korman, Melanie Korman, Jeremey Korman, Jeremy Cohen, Michel & Suzi Korman, as parents and next friends to A.K. and J.K, Minors;

Malgorzata Bonneville, Kaitly Bonneville, and Malgorzata Bonneville, as mother and next friend to N.B and D.B., Minors;

Katherine DeMaio; and,

Laurie Rail and Kailey Savve; and,

John Doe[1],

Plaintiffs,

vs.

NCL (BAHAMAS) LTD. d/b/a NCL,

Defendant.
______________________________________/

[1] The Plaintiff, John Doe, cannot publicly disclose his name due to the sensitive nature of his employment in law enforcement. We will provide his name and respond to discovery under seal, either through agreement with counsel for the defendant, or by order of the court, as necessary. See, for example, Florida Statute Section 119.07 et seq.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Wheeler, et. al (hereinafter "Plaintiffs"), sues Defendant, NCL (BAHAMAS) LTD. (hereinafter, "NCL" of "the cruise line") and alleges:

**THE PARTIES & JURISDICTION**

1. This Court has diversity jurisdiction over this matter pursuant to 28 USC §1332 because Plaintiffs are citizens of various states, outside the State of Florida, and Defendant is a Florida citizen and this is an action for damages that exceeds this Court's minimum jurisdictional requirements, to wit, $75,000.00, exclusive of all interest and costs.

2. This Court has original jurisdiction over this matter pursuant to 28 USC §1333(1) (admiralty).

3. Venue is proper in the United States District Court for Southern District of Florida pursuant to the forum selection clause contained in the passenger ticket between Plaintiff and Defendant.

4. At all times material, Plaintiffs were and are residents of and domiciled in various States,[2] and at all times material were passengers on board Defendant's vessel, *Breakaway*.

5. At all times material, Defendant, **NCL (BAHAMAS) LTD.**, personally or through an agent:

A. Operated, conducted, engaged and/or carried on a business venture in the State of Florida, and in particular Miami-Dade County, Florida;

B. Were engaged in substantial business activity in the State of Florida, and in particular, in Miami-Dade County, Florida;

[2] See Appendix I, attached hereto, with the listing all Plaintiffs' city, county, and state of residence.

C. Maintained its principal place of business in Miami, Miami-Dade County, Florida;

D. Operated vessels and provided vessels for cruises in the waters of this state;

E. Committed one or more acts as set forth in F.S. §48,081, 48.181 and 48.193, which submit the defendant to the jurisdiction and venue of this Court. Further, this court has jurisdiction of this action under 28 U.S.C. §1333(1);

F. The acts of defendant set out in the Complaint occurred in whole or in part in Miami-Dade County and/or the State of Florida;

6. All conditions precedent to the institution of this action have been satisfied, or otherwise excused, including the pre-suit notice required by the terms and conditions of Defendant's cruise ticket. (See notices letter attached as Exhibit "A"). (The ticket is no longer in Plaintiff's possession).

**GENERAL ALLEGATIONS**

7. NCL owns, operates and/or maintains the *Norwegian Breakaway* cruise ship.

8. NCL offered to Plaintiffs, as well as thousands of others, a cruise vacation to the Bahamas aboard the *Norwegian Breakaway*.

9. The *Norwegian Breakaway* was scheduled for a seven (7) day cruise leaving on a round trip cruise departing from New York on December 29, 2017 and traveling along the Eastern seaboard to the Bahamas.

10. Defendant, NCL, knowingly and intentionally choose to sail the Norwegian Breakaway, **carrying over 5,000 paying passengers and crew members, directly into the path of the January 2018 North American Blizzard (the "Bomb Cyclone")**.

11. Approximately 5,000 passengers and crew were subjected to days of sheer terror as the gigantic cruise ship was battered by high winds, freezing rain, and flooding caused by more than 30 foot waves.

12. The Norwegian Breakaway was in such disrepair that the vessel remained in a "listed" (sharp angle toward the sea) position as it was unable to right itself, due to the damage the vessel sustained, caused by the high winds and rough seas.

13. Defendant NCL's knowing, intentional, and reckless conduct subjects NCL to the imposition of punitive damages.

14. Prior to setting sail, there were numerous forecasts, which predicted the storm, and its general path that the Breakaway encountered.

15. The National Weather Service issued forecasts, as early as December 31, 2018, of the likelihood of hurricane-force winds, live tweeting:

> Our 96-hr forecast (valid 12Z January 4) highlights very dangerous #Atlantic marine conditions expected later this week. Rapidly intensifying low pressure is forecast to develop hurricane force winds on Thu as it lifts northward along the outer portion of our offshore zones.

16. At approximately 4 a.m. on Monday, January 1, 2018, the National Weather Service (NWS), Weather Prediction Center (WPC), reported the probability of heavy snow and ice to be caused by the Bomb Cyclone.[3]

17. On the morning of January 2, 2018, the Breakaway was scheduled to arrive at NCL's private island, Great Stirrup Cay. Passengers began leaving the ship by tender at approximately 8 AM, for what they expected to be a beach day. Soon after the first tenders

[3] https://web.archive.org/web/20180103232805/http://www.wpc.ncep.noaa.gov/discussions/hpcdiscussions.php?disc=qpfhsd&version=6&fmt=reg

arrived at the island, announcements stated that due to increasing seas and winds, the island was to be evacuated, and all passengers were to immediately return to the ship. Tender service to the island was canceled.

18. After the chaotic and frightening evacuation from Great Stirrup Cay on January 2, 2018, Plaintiffs were in constant terror aboard the *Norwegian Breakaway*.

19. Throughout the return voyage, the WPC continued to issue regular storm summaries reporting rapid cyclogenesis leading to the formation of a massive low pressure area north of the Bahamas and east of Jacksonville, Florida with cloud cover expanding to the North and East of the storm's center.

20. Many passengers felt abandoned by the Captain, due to a consistent lack of meaningful and reassuring announcements or information and updates after the ship had departed Great Stirrup Cay at approximately 11 a.m. on January 2, 2018, and throughout the harrowing voyage back to New York, ultimately arriving January 5, 2018.

21. The lack of reassurance and abandonment by the Captain and his staff contributed to passengers, mental anguish, terror, and fear of not returning home safely or surviving this horrific storm.

22. On the morning of January 4, 2018, and well into the Breakaway's return voyage through the Bomb Cyclone's pressure had worsened by 53 mbar to a pressure of 952 mbar. The drop in pressure was over twice the threshold (24 mbar in 24 hours) for bombogenesis.

23. Explosive cyclogenesis (also referred to as a weather bomb, meteorological bomb, explosive development, bomb cyclone or bombogenesis) is the rapid deepening of an extratropical cyclonic low-pressure area. The change in pressure needed to classify something as

explosive cyclogenesis is latitude dependent. For example, at 60° latitude, explosive cyclogenesis occurs if the central pressure decreases by 24 mbar (hPa) or more in 24 hours. This is a predominantly maritime, winter event.

24. NCL knew or should have known of these storm conditions, but nonetheless, the Norwegian Breakaway sailed back to New York intending to arrive on Friday, January 5, 2018 carrying more than 4,000 paying passengers through the Bomb Cyclone.

25. Upon arrival in New York City, the ship was covered in thick ice and snow, delaying docking and debarkation, further adding to passengers frustration, mental anguish, anxiety, and compounding an already difficult departure.




BREAKAWAY


NORWEGIAN



26. NCL had a 14 day journey scheduled to leave aboard the *Norwegian Breakaway* after the vessel arrived on Friday, January 5, 2018; however, due to severe damage sustained by the vessel, the ship was unable to depart until the following day, Saturday January 6, 2018.

27. As the vessel was heading back to port, the Captain informed the passengers that there was a weather system building along the east coast and he intended to sail through the growing storm. In other words, NCL was knowingly sailing directly towards the quickly intensifying Bomb Cyclone.

28. In a statement, NCL expressed that "[d]uring the early morning hours of January 4, Norwegian Breakaway encountered stronger than forecasted weather conditions due to winter storm Grayson. The safety of our guest and crew is always our top priority and the ship's Captain adjusted the ship's speed and itinerary accordingly to maintain the safest possible route, delaying the ship's arrival. Norwegian Breakaway returned safely to port approximately eight hours later than scheduled. Due to the late hour and the weather conditions, the ship remained alongside overnight, departing one day late for the next scheduled cruise. We sincerely apologize to our guests for the stronger than expected weather conditions and any resulting discomfort or inconvenience they may have experienced."[4]

29. The below image shows the projected path and the gigantic storm that NCL knowingly sailed through:

[4] https://weather.com/news/news/2018-01-10-lawsuit-cruise-line-grayson-bomb-cyclone



30. Waves were crashing over the top of the lifeboats tethered along the side of the *Breakaway* as the ship listed heavily.

31. Passengers scrambled to search for life jackets and/or floatation devices, but were unable to do so due to the listed position, inoperable elevators and flood hallways and pathways onboard.

32. There were many families with small children aboard the vessel. As parents, the Plaintiffs did their best to protect themselves and their young children who were crying uncontrollably and screaming in sheer terror.

33. These are examples of the damage done to the vessel in the storm:







34. Plaintiffs endured inoperable elevators; severely reduced services; hallways, walkways, public areas and stairways containing vomit and flooding; passengers screaming repeatedly; waves in excess of 40 feet; winds exceeding 80 mph; falling furniture, artwork, glass objects; and cabin flooding.

**COUNT I**
**NEGLIGENCE**

35. Plaintiffs re-allege all of the above allegations as if fully alleged herein and further alleges:

36. On or about January 2, 2018, and continuing until January 5, 2018, NCL and/or its agents, servants, and/or employees breached its duty to provide Plaintiffs with reasonable care under the circumstances.

37. Plaintiffs were injured due to the fault and/or negligence of Defendant, NCL, and/or its agents, servants, and/or employees as follows:

a. Failure to use reasonable care to provide and maintain a safe voyage for Plaintiffs and others similarly situated, fit with proper and adequate machinery, crew, and equipment; and/or

b. Knowingly sailing the subject vessel into severe weather conditions; and/or

c. Failing to have proper policies and procedures in place to determine whether to sail into dangerous weather conditions; and/or

d. Deciding to sail the vessel despite severe weather warnings; and/or

e. Failing to have adequate technology capable of properly monitoring weather conditions in real time;

f. Sailing the vessel into hurricane-force winds; and/or

g. Sailing the vessel into 30 foot seas; and/or

h. Failing to turn back the vessel and/or divert the vessel and/or seek safe harbor before and encountering the storm; and/or

i. Failing to warn passengers of the dangers of leaving the port in New York with the vessel in light of the expected weather and sea conditions; and/or

j. Failing to take a safe route from and to New York; and/or

k. Failing to alter route to a safe route while at sea; and/or

l. Exposing the vessel to weather and sea conditions that the vessel was unfit for; and/or

m. Failing to promulgate and/or enforce adequate policies and procedures to prevent the vessel from leaving port into an expected storm; and/or

n. Failing to promulgate and or enforce adequate policies and procedures to require the vessel to turn around and/or seek safe harbor when encountering an expected storm became likely; and/or

o. Failing to use reasonable care to promulgate and/or enforce adequate policies and procedures to ensure that the vessel was operated in a safe weather conditions; and/or

p. Exposing its passengers to hurricane force weather conditions; and/or

q. Failure to provide adequate training, instruction, and supervision to the captain and crew; and/or

r. Failure to promulgate and/or enforce adequate policies and procedures to ensure that safety would not be compromised for cost and/or profits; and/or

s. Failure to adequately maintain the *Breakaway*, its engines and machinery, so as to prevent the failure of shipboard systems necessary to ensure the reasonable safety of its passengers; and/or

t. Failure to adequately inspect the *Breakaway*, its engines and machinery, so as to prevent the failure of shipboard systems necessary to ensure the reasonable safety of its passengers; and/or

u. Failure to promulgate policies and/or procedures aimed at preventing the failure of shipboard systems necessary to ensure the reasonable safety of its passengers; and/or

v. Failure to promulgate policies and/or procedures aimed at ensuring an adequate emergency plan to protect the health and welfare of passengers during an emergency; and/or

w. Failure to determine and/or appreciate the hazards associated with operating the subject vessel's propulsion system while encountering severe weather and sea conditions; and/or

x. Knowing, as a result of previous similar incidents, of the likelihood of a threat to passenger safety resulting from all of the above, yet failing to take corrective action and/or implement policies and procedures aimed at

preventing and/or mitigating the harmful effects of the of the subject incident; and /or

y. Failure to promulgate adequate storm avoidance policies aimed at ensuring the safety of passengers; and/or

z. Failure to employ an in-house meteorological staff tasked with monitoring storms and/or sea conditions to ensure the safety of passengers.

38. At all material times, Defendant NCL had exclusive custody and control of the vessel, *Breakaway*.

39. Defendant knew of the foregoing conditions causing Plaintiffs' injuries and did not correct them, or the conditions existed for a sufficient length of time so that Defendant in the exercise of reasonable care under the circumstances should have learned of them and corrected them.

40. As a result of the negligence of NCL, Plaintiffs were injured about Plaintiffs' body and extremities; suffering both physical pain and suffering; mental and emotional anguish; loss of enjoyment of life; temporary and/or permanent physical disability and/or impairment; inconvenience in the normal pursuits and pleasures of life; feelings of economic insecurity; disfigurement; aggravation of any previously existing conditions therefrom; incurred medical expenses in the care and treatment of their injuries including life care; suffered physical handicap; and lost wages, income lost in the past, and impairment of their working ability and earning capacity. The injuries and damages are permanent and/or continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, the Plaintiffs demands judgment for all damages recoverable under the law against the Defendant, including punitive damages, and demands trial by jury.

**COUNT II – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

41. Plaintiffs re-allege all of the above allegations as if fully alleged herein and further alleges:

42. At all times material, due to the negligence and/or gross negligence and/or intentional conduct of the Defendant, Plaintiffs and all others similarly situated were placed in an immediate risk of physical harm. Said risk of physical harm included but is not limited to: injury and/or death and/or severe emotional and/or psychological trauma.

43. Defendant's negligence and/or gross negligence and/or intentional conduct caused severe mental and/or emotional harm and/or distress in the Plaintiffs and all others similarly situated, such as fear and anxiety. These emotional injuries and/or damages have also resulted in physical manifestations, such as sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep and nightmares.

44. During the time period alleged in the complaint, Plaintiffs and those similarly situated were confined to their stateroom and were subjected to the storm causing a reasonable fear of death and the sinking of the vessel.

45. Plaintiffs and those similarly situated aboard the *Breakaway* were placed in the zone of danger as a result of the violent storm. Each Plaintiff was in close proximity to conditions which did cause or could have caused serious physical, mental and/or emotional injury and/or illness.

46. Plaintiffs fear of death and experience of mental, emotional and/or physical harm was genuine and well founded and Plaintiffs suffered mental or emotional harm (such as fright and anxiety) that was caused by the negligence of NCL. This fright and anxiety has further

manifested itself as multiple physical symptoms experienced by the Plaintiffs, including but not limited to insomnia, depression, anxiety, nightmares, and dizziness.

47. As a result of the negligent inflection of emotional distress by NCL, Plaintiffs were injured about Plaintiffs' body and extremities; suffering both physical pain and suffering; mental and emotional anguish; loss of enjoyment of life; temporary and/or permanent physical disability and/or impairment; inconvenience in the normal pursuits and pleasures of life; feelings of economic insecurity; disfigurement; aggravation of any previously existing conditions therefrom; incurred medical expenses in the care and treatment of their injuries including life care; suffered physical handicap; and lost wages, income lost in the past, and impairment of their working ability and earning capacity. The injuries and damages are permanent and/or continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

**WHEREFORE**, the Plaintiff demands judgment for all damages recoverable under the law against the Defendant, including punitive damages, and demands trial by jury.

**COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

48. Plaintiffs re-allege all of the above allegations as if fully alleged herein and further alleges:

49. As set forth above, the actions of NCL were intentional and/or reckless inflicting severe emotional distress and inflicted mental suffering. NCL's actions, both by placing the subject vessel in a violent storm and subjecting passengers to a reasonable fear of death, despite NCL's prior knowledge of the impending storm, was extreme and outrageous conduct. This conduct is made more outrageous by the fact that NCL was motivated by its desire to make a

profit, valuing swift return to port, rather than delaying the vessel's return and ensuring the reasonable safety and welfare of its passengers.

50. NCL's conduct caused the Plaintiffs, and all those similarly situated, to suffer through the fearful conditions alleged above.

51. All of the conditions previously alleged and endured by the Plaintiffs caused severe suffering and emotional distress as these conditions not only led to immediate risk of physical harm, but also caused severe discomfort, anxiety, and feelings of helplessness/hopelessness as the *Breakaway* sailed through the Bomb Cyclone.

52. The conduct of NCL as alleged above is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, should be regarded as atrocious and utterly intolerable in a civilized community. Put simply, NCL recklessly and intentionally put more than 5,000 passengers and crew members through a living nightmare so it could protect its bottom line.

53. As a result of the intentional inflection of emotional distress by NCL, Plaintiffs were injured about Plaintiffs' body and extremities; suffering both physical pain and suffering; mental and emotional anguish; loss of enjoyment of life; temporary and/or permanent physical disability and/or impairment; inconvenience in the normal pursuits and pleasures of life; feelings of economic insecurity; disfigurement; aggravation of any previously existing conditions therefrom; incurred medical expenses in the care and treatment of their injuries including life care; suffered physical handicap; and lost wages, income lost in the past, and impairment of their working ability and earning capacity. The injuries and damages are permanent and/or continuing in nature, and Plaintiffs will suffer the losses and impairments in the future.

54. Plaintiffs were injured about Plaintiffs' body and extremities, suffered both physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, temporary and/or permanent physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of their injuries including life care, suffered physical handicap, lost wages, income lost in the past, and their working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiff will suffer the losses and impairments in the future.

**WHEREFORE**, the Plaintiffs demands judgment for all damages recoverable under the law against the Defendant, including punitive damages, and demands trial by jury.

Dated: December 21, 2018

**HOLZBERG LEGAL**
Offices at Pinecrest II, Suite 220
7685 S.W. 104th Street
Miami, Florida 33156
Telephone: (305) 668-6410
Facsimile: (305) 667-6161

BY: *__/s/ Glenn J. Holzberg__*______
GLENN J. HOLZBERG
Florida Bar No.: # 369551